DENNIS R. BAGNERIS, SR., Judge.
|! This is an appeal from a concursus proceeding. The appellants, Josh Jones and Waterfront Developers (collectively, “Jones”); John Fayard and JJK & A Holding Corporation (collectively, “Fa-yard”); and James Moore, Pamela Moore and Landman, LLC (collectively, “Moore”) were the only claimants to assert entitlement to funds deposited in the registry of the court by Pearl River Navigation (“PRN”) in connection with the sale of property acquired through the City’s Sale of Adjudicated Properties (“SOAP”) program.[1] Their appeal argues that the trial court erred in awarding the bulk of the funds to the City, a non-party to the con-cursus proceeding. For the reasons that follow, we vacate the judgment and remand to the trial court for further proceedings consistent with this opinion.
FACTS/PROCEEDINGS BELOW
This dispute relates back to October 10,. 2003 when Moore entered a contract with Fayard to acquire commercial properties from the City through its SOAP program. *1116 The agreement required Moore to identify SOAP properties for purchase and for Fa-yard to provide all the necessary funding for the acquisition. The properties would be titled in the name of Fayard’s company, JJK & A. Moore and Fayard would share net profits of any re-sale on a 50-50 basis after Fayard’s costs were reimbursed.
|2In connection with this agreement, Moore submitted a SOAP application to the City for the property that is the subject of this dispute, 19759 Chef Menteur Highway (hereinafter, “the property”). The City issued a preliminary approval letter on December 19, 2003 in the name of JJK & A. In order to finalize the sale, the City required JJK & A to pay all costs of appraisal, legal fees, recording fees, and one-half of the appraised value of the property. The appraised value in this instance was $80,000.00-which meant the City’s purchase price was $40,000.00
Moore alleged that Fayard balked at putting up the $40,000.00; consequently, he approached Jones and his company with the deal. On January 5, 2005, Moore and Jones entered, into a contract to acquire the same property. Their agreement also required Jones to the pay costs associated with the property’s acquisition and that net profits from their sale of the property would be shared on a on a 50-50 basis.
Jones and his wife, Elizabeth “Becky” Jones, a real estate agent with Keller Williams Realty, located a buyer, PRN. PRN agreed to purchase the property from Moore and Jones once they acquired the property from the City. On January 7, 2004, Mrs. Jones executed a Dual Agency Disclosure Agreement amongst Jones, Moore, and PRN, in which PRN agreed to pay $230,000.00 for the property.
Moore advised Fayard that PRN agreed to purchase the property. However, he did not apprise Fayard of Jones’ contractual interest in the property. As the matter moved towards the March 19, 2004 closing date, Moore attempted to substitute Jones’ name as the buyer on the pre-approved application with the City. |3The City did not allow the substitution. As a result, JJK & A remained as the City’s approved applicant to purchase the property.
Shortly before closing, the transaction shifted from a dual sale — wherein the property would be acquired from the City for and then re-sold to PRN for $230,-000.00 — to an assignment to PRN of the right to purchase the property from the City. Moore advised Fayard of this change. Fayard, who maintained he was scheduled to be out of town on the closing date, executed a “Unanimous Consent” document that allowed Moore to close the transaction with PRN on behalf of JJK & A. The specific authority granted by Fa-yard was to “authorize James J. Moore to execute an act of assignment of application and contract to purchase a tax sale deed from the City of New Orleans.”
The City permitted PRN to be assigned the right to purchase the property. As a result of the assignment, PRN agreed to purchase the property directly from the City for $40,000.00. This reduced the amount PRN paid for the assignment rights to $190,000.00. PRN’s direct purchase from the City meant that neither Fayard nor Jones had to fund the City’s $40,000.00 purchase price as per their contractual agreements with Moore. The parties to the Assignment of Contract agreement included Moore, in his individual capacity and as an agent of JJK & A (Fayard); Jones; and a representative of PRN.
PRN could not obtain title insurance on the property; and at its demand, the parties placed the $190,000.00 in escrow. *1117 Upon PRN’s receipt of a clean title, the escrow agreement provided that the assignment purchase funds would be ^distributed as follows: $23,000.00 to Keller Williams Realty; $40,000.00 to James Moore, Landman, L.L.C.; $40,000.00 to JJK & A Holding, Inc.; and $87,000.00 to Waterfront Developers, Josh B. Jones, and Elizabeth Jones.[2]
Collateral litigation arose in connection with PRN’s purchase of the property. This included a suit filed by the property’s original owner against PRN and the City.[3] In response, Moore, Fayard, and Jones agreed to have PRN deposit the assignment sale funds into the registry of the court.
After the validity of PRN’s sale was upheld, competing claims were made to the escrow funds by Jones, Fayard, Moore, PRN, and Keller Williams. The trial court awarded Keller Williams Realty $23,000.00 for its real estate commission claim and PRN settled its costs claim against Jones, Fayard, and Moore for $25,000.00. This left approximately $142,000.00 for distribution among Jones, Fayard, and Moore.
The present concursus hearing took place on June 9, 2014. At the hearing, Becky Jones stated that she and her husband secured PRN as the eventual buyer of the property. She identified the purchase agreement contract signed by Jones, Moore, and PRN. She claimed that Moore told her that Fayard was no longer a partner in the transaction.
UJones acknowledged that his contract with Moore required him to fund the costs and the City’s $40,000.00 purchase price. Jones submitted evidence that showed he paid about $6900.00 in costs. He added that the only reason that he did not produce the $40,000.00 at closing was because PRN agreed to directly pay that amount to the City. He had some awareness that Fayard had previously been connected with the property. He recollected a conversation with Fayard wherein Fayard said that Jones would be stupid to put up the $40,000.00. Jones stated he believed that he and his wife were entitled to the funds as outlined in the escrow agreement because they located PRN, the eventual buyer.
Moore testified that he initially entered a contract with Fayard to acquire SOAP properties. He stressed that he did all the leg work to locate the instant property and that it was Fayard’s responsibility to put up the costs. He contended that he only approached Jones because Fayard essentially breached their agreement when he refused to put up the $40,000.00 to purchase the property from the City. Moore believed that the unanimous consent form Fayard signed authorized Moore to act on Fayard’s behalf and do what was necessary to acquire the property and complete the act of sale. Moore relayed that he left the closing in frustration when it appeared that Jones also would not produce the City’s $40,000.00 asking price. He claimed that the escrow agreement was incomplete when he signed it. In particular, it did not *1118 contain terms for the distribution of the $190,000.00 and he did not agree to those distribution terms.
IfiFayard initially described Moore as an employee of his company. He denied that they had a contract. However, he conceded that a contract must have existed when he was shown a copy of the agreement. Fayard said he paid Moore approximately $10,000.00 to develop SOAP properties for purchase. He claimed that he stopped paying Moore on other properties because it did not seem that those acquisitions would come to fruition. However, he asserted that he would have provided the $40,000.00 to complete the purchase of the subject property from the City had it been necessary. Fayard maintained that his only purpose in giving Moore the unanimous consent form was to execute the assignment to purchase the tax deed sale from the City. He said he did not authorize Moore to sign the escrow agreement and did not consent to its terms. Fayard denied that he had any conversations with Jones and claimed he was unaware of any involvement by Jones in the property’s acquisition until after the act of sale was completed.
At the conclusion of the hearing, the trial court asked all the parties to submit proposed judgments. The trial court rendered judgment on August 19, 2014.
The trial court’s judgment was as follows: $15,000.00 to JJK & A Holding Corporation and John Fayard; $5,100.00 to James Moore, Pamela Moore and Land-man, LLC; $21,690.00 (includes costs) to Josh Jones and Waterfront Developers, LLC; and $100,000.00 to the City of New Orleans. The judgment also awarded any funds that remained in the registry of the court to the City of New Orleans. In the trial court’s reasons for judgment, the court stated:
[7It is this Court’s opinion that the escrow agreement is a nullity for a variety of reasons. Not only is it impossible to perform, it unjustly enriched all of the claimants. Neither Fayard nor Jones put up any of the funds called for under the original contract. Jones and his wife were rewarded for their efforts in finding a purchaser through the real estate commission that Keller Williams received. Had Moore not been deceptive, none of this litigation would have ensued.
This Court finds that under the law of equity, The City is entitled to a large sum of money rather than the claimants. The Court assesses all costs to Moore due to his duplicity and self-dealings.
In response, the parties filed joint motions for new trial and to set aside judgment and reasons for judgment. The motion for new trial was denied. However, the trial court supplied additional reasons for judgment to clarify its award to the City, a non-party. It explained in its Additional Reasons for Judgment:
None of the parties did anything to justify the large amount of money they claimed. The City held the property in question under its SOAP Program. The property was obviously undervalued. In a different scenario, the City would have sold the property directly to Pearl River and would have reaped the financial benefits. To reward the “middlemen” who literally did nothing would be unconscionable.”
This appeal followed.
STANDARD OF REVIEW
The seminal issue presented by the appellants’ assignments of error is whether the trial court had the authority to award funds to a non-party in a concursus proceeding. This issue is a legal one. Accordingly, the standard of review is de novo. See Oakville Community Action *1119 Group v. Plaquemines Parish Council, 08-1286, p. 6 (La.App. 4 Cir. 2/18/09), 7 So.3d 25, 28.
|RLAW/DISCUSSION
A concursus proceeding is one in which two or more persons having competing or conflicting claims to money, property, or mortgages or privileges on property are impleaded and required to assert their respective claims contradictorily against all other parties to the proceeding. See La. C.C.P. art. 4651. Claimants having competing or conflicting claims may be im-pleaded in a concursus proceeding; however, no claimant may be impleaded in a concursus pleading whose claim has been prosecuted to judgment. See La. C.C.P. art. 4652. Moreover, except as otherwise provided, rules of ordinary proceedings apply to concursus proceedings. See La. C.C.P. art. 4652. When we apply these statutory provisions to the present matter, we find the trial court erred in awarding any of the concursus funds to the City.
The undisputed facts show that the competing claims in this concursus action arose out of the appellants’ respective claims to the funds PRN deposited in the court’s registry for the amount PRN paid to purchase the assignment rights. The City was not a party to the Assignment Contract. None of the parties impleaded the City into the concursus proceedings. The City itself never affirmatively made a claim to the funds or contradictorily asserted any entitlement to the funds as contemplated by La. C.C.P. art. 4651 or La. C.C.P. art. 4662.
Moreover, based upon our review of the record, the facts suggest that the City may not have a right or cause of action to any of the deposited funds. As previously referenced herein, the City accepted, without dispute, the $40,000.00 it Rasked PRN to pay in order to buy the property directly from the City. The City vouched for the validity of that sale in previous litigation and the Louisiana Supreme Court effectively upheld the sale’s legitimacy.[4] Therefore, pursuant to La. C.C.P. art. 4652, the City has no apparent right of action because any demand that PRN owed it additional funds in connection with the property’s acquisition has already been prosecuted to judgment. Similarly, we do not see a cause of action to the concursus funds because the City has been paid what it was owed.
In a concursus proceeding, jurisdiction of the court is limited to disposing of funds on deposit and relieving the stakeholder from further liability to the im-pleaded claimants arising out of or as a result of the stakeholder’s ownership or possession of the fund; interpleaded claimants must establish their respective claims to the fund. See Wills v. National Automotive Ins., 41,034 (La.App. 2 Cir. 4/12/06), 926 So.2d 771; Landry & Passman Realty, Inc. v. Beadle, Swartwood, Wall & Associates, Inc., (La.App. 1 Cir. 1974), 303 So.2d 761, writ refused 307 So.2d 631 (La.1975). The City is not an impleaded claimant to the funds nor has it established any claim to the funds. Therefore, we find that the trial court lacked authority to make any award to the City as a non-party to these concursus proceedings.
We also agree with the appellants that the trial court’s reliance on equity to distribute funds to the City is not supported by law. La. C.C. art. 4 provides that “[WJhen no rule for a particular situation can be derived from legislation or Imcustom, the court is bound to proceed according to equity. To decide equitably, resort is made to justice, reason, and pre *1120 vailing usages.” Where there is positive law on the subject matter at issue, equity cannot be evoked by the court. Dupont v. Hebert, 06-2334 (La.App. 1 Cir. 2/20/08), 984 So.2d 800. In the present matter, specific statutory and jurisprudential schemes exist through concursus proceeding for parties to assert competing claims to funds deposited in the court’s registry. Accordingly, the trial court could not evoke equity as a reason to distribute funds to the City.
The trial court’s reasons for judgment also infer that the City should recover funds under a theory of unjust enrichment because the appellants did not anything “to justify the large amount of money they claimed” and to reward them would be “unconscionable.” For a party to recover under the theory of unjust enrichment, he must prove an enrichment, an impoverishment, a causal relationship between the enrichment and the impoverishment, an absence of justification, or cause for the enrichment or impoverishment, and the lack of any other remedy at law. See Denbury Onshore, L.L.C. v. Pucheu, 08-1210 (La.App. 3 Cir. 3/11/09), 6 So.3d 386. In this matter, the trial court. cited no evidence to support that the appellants engaged in any suspect conduct that “impoverished” the City or deprived it of any funds to which it otherwise would have been entitled. Instead, the record showed that they complied with the City’s policies to acquire the SOAP property. In particular, the City received its $40,000.00 asking price based on its $80,000.00 appraised value. The SOAP program did not prohibit the City’s purchaser from rejsaleu nor did it state that the City was entitled to any funds from the re-sale. Although the appellants may have been duplicitous with one another, the object of their contracts— to share re-sale profits — was valid. Hence, the appellants can assert their entitlement to be “rewarded” from the concur-sus funds PRN paid for the assignment.
Based on the foregoing reasons, we find no basis in law, fact, or equity for the trial court to have awarded any concursus funds to the City. Accordingly, the judgment of the trial court is vacated and the matter is remanded to the trial court to distribute the funds among the appellants, the actual impleaded parties to the concursus proceedings.[5]
VACATED AND REMANDED.

. The SOAP program, ag per La. R.S. 33:4720.12, allowed the City to acquire and sell abandoned properties as a means to combat blight and revitalize certain areas.

. As discussed later herein, Moore and Fa-yard contend they did not agree to the distribution terms outlined in the escrow agreement.

. International Marine Carriers, Inc. ("IMC"), the original owner, filed suit against PRN and the City claiming that the SOAP application contained false statements that rendered the sale invalid. Ultimately, the validity of the sale was upheld when this Court determined that PRN lacked standing to challenge the sale and the Supreme Court denied writ review. See International Marine Carriers, Inc. v. Pearl River Navigation, Inc., 11-1258 (La.App. 4 Cir. 2/15/12), unpub., 2012 WL 745294, 81 So.3d 1019 (Table), writ denied, 2012-0837 (La.5/25/12), 90 So.3d 418 (Mem.).

. See fn. 3.

. Having determined that the trial court erred in distributing funds to the City, we pretermit discussion of Moore's claim that it also erred in assessing costs against him in its reasons for judgment.